FILED
CLERK, U.S. DISTRICT COURT
6/28/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: VAV DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

March 2022 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>LE AHN TUAN,<br><br>　　　　Defendant. | CR 2:22-cr-00273-JLS<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1349: Conspiracy to Commit Wire Fraud; 18 U.S.C. § 1956(h): Conspiracy to Commit Money Laundering; 18 U.S.C. § 2461(c): Criminal Forfeiture] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1349]

A. INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

**Relevant Entities and Individuals**

1. The Baller Ape Club was a non-fungible token ("NFT") investment program that sold NFTs in the form of various cartoon figures, often with the figure of an ape (a "Baller Ape").

2. The Baller Ape Club conducted its business principally by means of a website accessible at www.ballerapeclub.com (the

"Baller Ape Website"). The website purported to offer investors the ability to purchase Baller Apes. The Baller Ape Website was accessible worldwide to the public and was accessed by individuals within the Central District of California and elsewhere.

3. Defendant LE AHN TUAN was a citizen of Vietnam. Defendant TUAN founded and registered the Baller Ape Website. During the registration process, defendant TUAN used another individual's identity to conceal his control over the Baller Ape Website. Less than a month after launching the purported investment program, defendant TUAN and his co-conspirators engaged in a "rug pull," that is, they abruptly closed the Baller Ape Website and stole all investors' funds.

4. Co-Conspirator 1 ("CC-1"), an affiliate of the Baller Ape Club, resided in Mexico. Among other things, CC-1 functioned as a money launderer for the Baller Ape Club and was responsible for concealing the source, origin, and control of funds received from Baller Ape investors.

5. Company 1 was a U.S.-based entity and website domain name registrar that provided domain name registration and web hosting services. Defendant TUAN registered the Baller Ape Website through Company 1, and also purchased services through Company 1 for the Baller Ape Website. Defendant TUAN accessed the Company 1 website through a unique IP address associated with defendant TUAN.

6. Company 2 was a U.S.-based entity that provided customers with protection against cyber-attacks. Defendant TUAN accessed the Company 2 website through a unique IP address associated with defendant TUAN.

**Relevant Terms**

7. A "cryptocurrency" was a digital currency in which transactions were verified and records were maintained by a decentralized system using cryptography, rather than a centralized authority such as a bank or government. Like traditional fiat currency, there were multiple types of cryptocurrencies, including Bitcoin ("BTC"), Ethereum ("ETH"), Solana ("SOL"), and Dai ("DAI").

8. The "blockchain" was a distributed public ledger that recorded incoming and outgoing cryptocurrency transactions. The blockchain recorded, among other things, the date and time of each cryptocurrency transaction, the unique cryptocurrency addresses associated with the transaction and the sending and receiving parties, and the amount of cryptocurrency transferred. The blockchain, however, did not identify the parties that controlled the cryptocurrency addresses involved in the transaction.

9. Cryptocurrency owners typically stored their cryptocurrency in digital "wallets," which were identified by unique electronic "addresses." By maintaining multiple cryptocurrency addresses, criminals engaged in cryptocurrency-based fraud could attempt to thwart law enforcement's efforts to track the flow of fraud proceeds by quickly transferring such proceeds in various amounts through multiple cryptocurrency addresses and across multiple blockchains.

10. "Chain-hopping" referred to the technique commonly used by perpetrators of cryptocurrency frauds to convert one form of cryptocurrency into another and move funds, including fraud proceeds, from one blockchain to another. Chain-hopping

enabled fraud perpetrators to swap one type of cryptocurrency for another -- for example, BTC to SOL -- to disguise the source of the funds used to purchase the original cryptocurrency and to obstruct the ability of law enforcement to trace the movement of fraud proceeds across various cryptocurrency addresses.

11. Criminals in the cryptocurrency fraud space frequently used decentralized cryptocurrency "swap services," which referred to a service that could convert one cryptocurrency into another cryptocurrency in order to disguise, obscure, and obfuscate the trail that would lead to the funds' original source.

12. An "NFT" was a non-interchangeable unit of data stored on the blockchain that could be sold and traded. Some NFTs were part of the Solana blockchain, which was one of the largest open-source blockchains. SOL was the native cryptocurrency of the Solana blockchain.

13. There were different types of NFT data files that could be purchased. The most basic NFT data file was like a .jpeg image file that provided an investor with an electronic image and a certificate of ownership. By contrast, a "utility" NFT data file offered added benefits, such as reward programs, giveaways, and early access to events for NFT holders.

14. Each NFT was commonly referred to as a "token," which was uniquely identifiable on the blockchain.

15. The process of turning a digital file into an NFT (i.e., a crypto collectible or digital asset) on the Solana blockchain was typically referred to as "minting." The digital file was stored on the Solana blockchain, and typically could not be edited, modified, or deleted.

16.     The minting of an NFT required the creation of a "smart contract," which was recorded on the blockchain and outlined the rules that governed the sale and any subsequent transfers of the NFTs after minting.  NFT smart contracts were written in computer code and publicly viewable on the Solana blockchain.

17.     A "rug pull" was a colloquial term that referred to a scenario where the creator of an NFT program solicited investments and then abruptly abandoned a program and fraudulently retained the program investors' funds.

B.      THE OBJECT OF THE CONSPIRACY

18.     Beginning no later than in or around September 2021 and continuing until at least in or around March 2022, in Los Angeles County, within the Central District of California, and elsewhere, defendant TUAN conspired with CC-1 and others known and unknown to the Grand Jury to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

C.      THE MANNER AND MEANS OF THE CONSPIRACY

19.     The object of the conspiracy was to be carried out, and was carried out, in substance, as follows:

**Overview of the Baller Ape Rug Pull**

20.     In September 2021, defendant TUAN formed, registered, and funded the Baller Ape Club Website.  Various social media communication platforms began advertising the sale of Baller Ape NFTs.  These platforms directed interested investors to the Baller Ape Club Website, which defendant TUAN controlled.

21.     Defendant TUAN's Baller Ape Club Website marketed the sale of Baller Ape NFTs, which were electronic images of various cartoon ape figures, as depicted below in screenshots taken from

the Baller Ape Club Website:





22. In addition to the sale of the digital NFT image, the Baller Ape Club Website advertised the following benefits:

a. Access to "an exclusive VIP Lounge where all fellow Primates gather to flex their Rolex, NFT's and sip on a banana cocktail," and where "benefits, offerings and rewards will increase over time."

b. Donations to "a number of charity organizations, starting with 50 SOL to a charity of the Club's choosing, [that] we will achieve . . . through community voting power on our Discord."

c. "All Baller Ape holders receive 5% in Sol [SOL] rewards."

23. The Baller Ape Club Website also claimed that a "rarity app . . . will be available via our website after minting is complete, thus will allow all holders to get their exact [NFT] rarity statistics!"

24. The images below are screenshots taken from the Baller Ape Club Website and show the advertised "roadmap" and plan for October 2021 to December 2021, which purportedly was to be implemented immediately following the Baller Ape NFT sale. In particular, the "Roadmap to VIP" advertised, among other things, that when 100% of the Baller Apes were sold, the Baller Ape NFT program developers would "fund our ape community wallet with 500 sol [SOL]."



**100% SOLD**

We will fund our ape community wallet with 500 sol.

**ENTRY CLOSED**

Begin our marketplace, as well as list on solanart and digital.eyes so our valued ape holders can list, buy and sell their Baller Apes.

**BALLER PHASE II**

As all of our Baller Apes are males, we plan on releasing a new category of female 'Babe Apes' that will join the Club. This feature will allow our Baller Ape Members to mint a free 'Babe Ape' just for holding their collectables. COMING SOON!

Members Only, limited edition merchandise to be released, including t-shirts, hoodies, hats, and much more!

...begin and all Members of the Club will be able to view their Baller Apes.

### October 2021

- Marketplace listing on solanart & DigitalEyes directly after launch
- Baller Ape Club marketplace launch
- Submit orders for the Baller Ape hats, Hoodies & t-shirt mint rewards
- Announce the winners of the Silver BAC Collector, Golden BAC Collector and King BAC Collector rewards.
- Open the verified holder and club members only discord channels
- Begin the DIY contests for holders
- Launch on howrare
- Begin the Metal BAC Print minter raffle
- Introduce website rarity checker
- Use an allocation of the community funds to sweep the floor 24-48 hours post launch
- Host daily contests and giveaways within the member's only discord channels
- Complete second charity donation (mid-October)
- Confirm Baller Ape Chain winner
- Finish the website portal to track mint and holder royalties
- Confirm designs for our holder only Baller Ape merch store

### November 2021

- Begin working with the holders on the Baller Ape DAO
- Open pre-orders for our first Baller ape holder merch drop
- Create the Baller Babes collection, featuring 5,000 unique Baller Babe to partner with your Baller ape. Holders of a Baller Ape will be able to mint a Baller Babe for free.
- Collaborate with viral brands and media providers to bring more coverage to the solana NFT scene and more importantly The Baller Ape Club
- Complete Donation 3 on live stream
- Host public events with the swept floor Baller apes as prizes
- Begin planning and building the baller ape interactive game with Baller Ape NFT integration
- Use the community fund to host a new range of giveaways, contests and competitions all related to helping grow the brand
- Ship out our season 1 merch drop and organise events and competitions which will require the use of your merch, and only available to merch owners
- Update our Baller Ape marketplace in preparations for the DAO

### December 2021

- Stake a portion of the community fund, to be unlocked in 3-6 months for guaranteed further growth boosts
- Ship out the completed Baller Ape Chain mint reward to the winner from ICEBOX
- Partner with a custom sneaker designer to create a limited edition collection of Baller Ape Air force ones
- Bring more community voting options in for the direction in which the club goes
- Host more raffles and implement the Christmas holiday Giveaways, events and rewards timeline. Open to baller ape members only
- Launch the Baller Ape DAO
- Secret announcement (New Year's Eve)
- Partner with global brand managers to bring the Baller Ape Club name to the masses
- More coming soon

25. Each Baller Ape was advertised to cost approximately 2 SOL, which, at the time of the Baller Ape NFT sale, was equivalent to approximately $282.14 to $323.36. In total, the Baller Ape Club Website advertised 5,000 Baller Ape tokens for sale.

26. On or about October 1, 2021, the Baller Ape Club Website permitted individuals to purchase a Baller Ape token through either a private presale or a public sale.

27. Approximately five minutes before the public sale began, conspirators operating a Baller Ape Club social media account informed potential investors that (1) the price was 2 SOL per Baller Ape token, (2) there was a maximum of two Baller Ape tokens per transaction, and (3) there was no limit as to the number of transactions a potential investor could make.

28. Conspirators operating the Baller Ape Club social media account mentioned in the preceding paragraph also provided potential investors with three additional website links to mint their Baller Ape tokens. The website links were connected to the Baller Ape Website that defendant TUAN created.

29. After a potential investor clicked on one of the three website links, the Baller Ape Website instructed the potential investor to "Please connect your wallet to buy Baller Ape NFTs." The Baller Ape Website then instructed the potential investor to allow the website link to connect to the cryptocurrency wallet the investor had selected. The Baller Ape Website then allowed the potential investor to input the number of Baller Ape tokens he or she wanted to purchase.

30. After inputting the number, the potential investor would click on a "Mint" button and be instructed to approve a

transaction transferring SOL to four particular SOL cryptocurrency wallet addresses (the "Baller Ape Wallet Addresses"). The Baller Ape Website represented that this transaction would cause the desired amount of SOL to be transferred in exchange for the equivalent number of Baller Ape tokens. The Baller Ape Website then falsely informed the investors that their transaction failed (the "Failed Transactions"), and that they would need to restart the NFT minting process.

31. Even though the potential investors received Failed Transactions notices, which falsely represented that SOL had not been transferred from the investors' cryptocurrency wallets, the SOL would in fact be transferred to the Baller Ape Wallet Addresses.

32. After investors' SOL had been transferred to the Baller Ape Wallet Addresses, defendant TUAN and his co-conspirators engaged in a "rug pull," meaning that they ended the NFT program prematurely and stole the investors' money. Defendant TUAN and his co-conspirators provided no NFTs or any of the promised benefits to the investors and deleted the Baller Ape Club Website and related social media accounts.

33. In total, through this conspiracy, defendant TUAN and his co-conspirators obtained approximately $2.6 million worth of SOL from investors in the Baller Ape program.

34. As a further part of the conspiracy, in order to prevent the investors from recovering the money that had been fraudulently obtained from the investors, defendant TUAN, CC-1, and their conspirators laundered investors' funds through the use of chain-hopping, decentralized cryptocurrency swap

services, and other common money laundering techniques designed to obfuscate the origin and subsequent movement of Baller Ape investors' funds.

35. In furtherance of the conspiracy:

    a. Defendant TUAN electronically would submit, and cause to be submitted, documents to Company 1 and Company 2, in connection with the creation of the Baller Ape Website;

    b. Defendant TUAN and his conspirators would use the Baller Ape Website to publish, and cause to be published, materially false statements to victim-investors regarding the use of funds, falsely representing that such funds would be used to acquire Baller Ape NFTs when, in fact, the funds would be stolen by defendant TUAN and his conspirators;

    c. Defendant TUAN and his conspirators, by and through their scheme to defraud victim-investors of money and other property, including cryptocurrency, by means of fraudulent pretenses, false representations, and false promises, would induce victim-investors to transmit, and cause to be transmitted, cryptocurrency by means of interstate and foreign wires.

    d. Defendant TUAN and his conspirators would hide the proceeds of their fraud by transferring and exchanging Baller Ape investors' funds into various cryptocurrencies and foreign currencies, and engaged in chain-hopping by transferring such funds across multiple blockchains.

D. OVERT ACTS

36. On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendant TUAN, CC-1, together with their conspirators, committed and knowingly caused

11

others to commit the following overt acts, among others, within the Central District of California, and elsewhere:

Overt Act No. 1: On September 14, 2021, defendant TUAN, using another individual's identity, registered the Baller Ape Website through Company 1, and paid for these services.

Overt Act No. 2: On September 14, 2021, defendant TUAN created an account for the Baller Ape Website through Company 2.

Overt Act No. 3: On October 1, 2021, defendant TUAN, together with other co-conspirators, caused C.M., a resident of the Central District of California, to electronically transfer approximately 18 SOL to the Baller Ape Website for the purchase of a Baller Ape NFT.

Overt Act No. 4: On September 14, 2021, defendant TUAN accessed the Company 1 and Company 2 accounts for the Baller Ape Website. After that day -- the day of the rug pull -- defendant TUAN never again accessed the Company 1 account nor the Company 2 account for the Baller Ape Website.

Overt Act No. 5: On February 1, 2022, CC-1 converted 10,015.00 DAI in Baller Ape investors' funds into foreign fiat currency.

Overt Act No. 6: On February 4, 2022, CC-1 converted 500.03562143 DAI in Baller Ape investors' funds into foreign fiat currency.

Overt Act No. 7: On March 6, 2022, CC-1 converted 494.19448476 DAI in Baller Ape investors' funds into foreign fiat currency.

## COUNT TWO

[18 U.S.C. § 1956(h)]

37. The Grand Jury re-alleges paragraphs 1 through 17 and paragraphs 20 through 34 of this Indictment here.

38. Beginning no later than in or around September 2021 and continuing until at least in or around March 2022, in Los Angeles County, within the Central District of California, and elsewhere, defendant TUAN, CC-1, together with others, known and unknown to the Grand Jury, knowingly and intentionally combined, conspired, and agreed among themselves to commit the following money laundering offense: to transport, transmit, and transfer, and attempt to transmit and transfer, monetary instruments and funds, from a place in the United States to and through a place outside of the United States, knowing that the monetary instruments and funds involved in such actual and attempted transportation, transmission, and transfer were designed in whole or part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of one or more specified unlawful activities, to wit: wire fraud in violation of Title 18, United States Code, Section 1343, all in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

FORFEITURE ALLEGATION

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

39. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of defendant LE AHN TUAN's conviction of the offenses set forth in either of Counts One and Two of this Indictment.

40. Defendant TUAN, if so convicted, shall forfeit to the United States of America the following:

    a. all right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offenses set forth in Counts One and Two of this Indictment; and

    b. to the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

41. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), defendant TUAN, if so convicted, shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of defendant TUAN, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other

property that cannot be divided without difficulty.

                              A TRUE BILL

                              /s/
                              _____
                              Foreperson

TRACY L. WILKISON
United States Attorney

[signature]

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

LORINDA I. LARYEA
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice

KEVIN LOWELL
Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice

TIAN HUANG
Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice